## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **The Retirees of the** ) | |
| **Goodyear Tire and Rubber Company** ) | |
| **Health Care Trust Committee** ) | |
| ) | **CLASS ACTION COMPLAINT** |
| ***and all others similarly situated,*** ) | |
| ) | **CIVIL ACTION NO. 13-10124** |
| ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| **State Street Corporation, State Street** ) | |
| **Bank & Trust Co.,** ) | |
| **and State Street Global Advisors,** ) | |
| ) | |
| Defendants. ) | |

Plaintiff, The Retirees of the Goodyear Tire & Rubber Company Health Care Trust Committee (the "Committee"), as fiduciary of the Goodyear Tire & Rubber Company Health Care Plan and Trust  (the "Goodyear VEBA" or "VEBA"), brings this action on behalf of the Goodyear VEBA , and on behalf of all similarly-situated ERISA plans (the "ERISA Plans") and other plans (the "Non-ERISA Plans"; collectively, the "Plans"), that suffered losses as a result of the breaches of fiduciary duties committed by Defendants State Street Corporation ("SSC"), State Street Bank & Trust Company ("SSBT"), and State Street Global Advisors ("SSGA") (collectively with their affiliates, the "Defendants"). The Committee brings this action by and through the undersigned attorneys based upon personal knowledge and information obtained through counsel's investigation. The Committee anticipates that discovery will uncover yet further substantial support for the allegations in this Complaint.

1.        This Complaint presents a case of fiduciary self-dealing and enrichment in violation of Defendants' fiduciary obligations under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA") and, alternatively, common law at the expense of the Plans (and their respective participants and beneficiaries), to whom Defendants owed some of the highest duties known to the law.

2.        The Goodyear VEBA is an employee welfare benefit plan within the meaning of ERISA §3(1).  It was established and funded by the Goodyear Tire and Rubber Company ("Goodyear") in August, 2008, pursuant to court order, to provide health and welfare benefits to its participants, all of whom are retirees from and former employees of Goodyear, or their spouses or dependents.

3.        Defendants were (and are) Plan fiduciaries, responsible for managing Plan investments prudently and solely in the interests of the Plan and its participants and prohibited from self-dealing and entering into certain other transactions described by ERISA and the common law.

4.        The Goodyear VEBA, like many other plans, invested in co-mingled or common trust funds offered and managed by Defendants (the "Common Trusts"). Common Trusts are investment funds that pool the investments of many institutional investors, much like mutual funds. Defendants received investment advisory, custodial, trustee, and administrative fees for managing the Common Trusts. By the phrase "Common Trusts," the Committee, to be clear, refers to all commingled investments trusts (excluding those Defendants call "collective trusts") operated by Defendants in which the Plans have invested.

5.        The Common Trusts engaged in a practice known as "securities lending" through which they made securities they held on behalf of the Plans available for loan to third

parties, such as short sellers, for short term use. In such an arrangement, the borrower secures the loan with collateral which is invested in various income-producing instruments so that the Common Trusts receive investment income from the collateral investment.

6.          Accordingly, third party borrowers provided the Common Trusts with cash collateral when they borrowed the Common Trusts' securities. The Common Trusts engaged in securities lending in order to garner the interest income generated from the collateral investment, which, given the extent of their holdings, could equal millions of dollars each year.

7.          Defendants controlled all aspects of the Common Trusts' securities lending programs. Defendants decided which securities would be loaned to which borrowers, collected the collateral from those borrowers, and invested that collateral in another set of co-mingled or pooled funds − which Defendants also managed and established solely for the purpose of investing the securities lending collateral in income-producing instruments (the "Collateral Pools"). As with the Common Trusts, Defendants received investment advisory, custodial, trustee, and administrative fees in exchange for managing the Collateral Pools.

8.          Upon return of the borrowed securities, the collateral is returned to the borrower. In addition, the borrower is generally paid a "rebate" (essentially interest) for the investment use of the collateral. The difference between (a) the gross income generated from Collateral Pool investments and (b) the fees and expenses of managing the Collateral Pools plus the rebate paid to the borrower is the "spread."  The spread is split between the manager of the securities lending program, commonly known as the Lending Agent, here Defendants, and the lenders, here the Plans. As alleged below, Defendants took an exorbitant share of the spread for themselves.

9.        In violation of ERISA § 406(b) and §406(a), prohibiting a fiduciary from engaging in self-dealing and certain specified transactions, and, alternatively, in violation of the common law, Defendants selected themselves to serve as the agent to provide securities lending services for the Plans, set their own compensation for such services and paid themselves for such services with Plan assets. In further violation of their fiduciary duties to the Plans under ERISA § 404 and the common law, Defendants took unreasonably large compensation for the securities lending services they provided, separate and apart from the fees they collected for managing the Common Trusts and Collateral Pools. Indeed, Defendants took **fifty percent of all income, *i.e.,* the spread, generated by the Collateral Pools for the benefit of the Common Trusts** (net of expenses and rebates as explained above). Thus, only fifty percent of the gains generated through the securities lending program managed by Defendants inured to the Plans. Defendants took from the Plans – to whom they owed fiduciary obligations – much higher compensation for managing securities than they collected from other institutional investors. Moreover, the fifty percent received by Defendants far exceeds industry standards.

10.       Defendants' excessive compensation is not surprising given that their investment relationship with the Plans was fraught with conflicts and self-dealing. As shown in greater detail below, Defendants, on the one hand, managed the Common Trusts and purportedly represented the Common Trusts and the Plans in setting the terms of and executing a Securities Lending Agreement with Defendants, on the other hand, representing themselves as the Lending Agent. The Defendants, acting as Lending Agent, then allocated to themselves, or an affiliate, the responsibility for managing the collateral investment program via the Collateral Pools. Essentially, Defendants, all of whom operate under the same corporate umbrella, negotiated with themselves the terms of their compensation, discretion, authority, and even liability. Not

surprisingly, these arrangements led to Defendants setting and receiving excessive and unreasonable compensation for themselves.

11.        Every dollar Defendants collected in excess of reasonable compensation was one dollar less that the Plans, and their respective participants and beneficiaries, received. Moreover, the Plans suffered additional losses in the form of lost investment opportunity on the securities lending income wrongfully taken by Defendants for themselves where such income would have been reinvested in the respective Common Trusts, rather than taken by Defendants for their own profit and use. As a result, the Plans suffered hundreds of millions of dollars in losses due to Defendants' fiduciary breaches and prohibited self-dealing.

## I. JURISDICTION AND VENUE

12.        This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, ERISA §502(e)(1), codified at 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1332. The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

13.        Venue is proper in this district pursuant to ERISA §502(e)(2), codified at 29 U.S.C. §1132(e)(2), and 28 U.S.C. § 1391, because SSC, SSBT, and SSGA are located in this judicial district.

## II. THE PARTIES

**Plaintiff**

14.        The Committee is the named fiduciary of the Goodyear VEBA. As such, the Committee is authorized under ERISA §502(a)(2) and the common law to represent the Goodyear VEBA in lawsuits arising under ERISA and, alternatively, the common law. As of

December 31, 2010, the Goodyear VEBA held approximately $940 million in assets. The Goodyear VEBA Summary Annual Report is available at http://www.goodyear-veba.com.

15.     The Goodyear VEBA invested its assets with State Street. Specifically, during the period September 30, 2008 through September 30, 2010, the Goodyear VEBA invested in the following Common Trusts offered or managed by Defendants which participated in Defendants' securities lending program: Credit 1-3 Year Index SL CTF; Passive Bond Market SL CTF; Russell 3000 Lending Index CTF; MSCI EAFE Index SL CTF; Credit 3-10 Year Index SL CTF; and the MSCI Emerging Markets Index SL CTF.

**Defendants**

16.     **State Street Bank & Trust Company ("SSBT")**. SSBT is the principal banking subsidiary of SSC. SSBT is an investment manager of the funds in the Goodyear VEBA and is located at 3 Batterymarch Park, Quincy, Massachusetts. As trustee, SSBT is, by definition, a fiduciary to the Plan.

17.     **State Street Corporation ("SSC")**. SSC is a financial holding company, organized in 1970 under the laws of the Commonwealth of Massachusetts. Through its subsidiaries, including its principal banking subsidiary, SSBT, SSC provides a full range of products and services for institutional investors worldwide. Its executive offices are located at One Lincoln Street, Boston, Massachusetts.

18.     **State Street Global Advisors ("SSGA")**. SSGA is the investment management arm of SSC. On information and belief, SSGA is the Investment Manager, and therefore a fiduciary, for some or all of the Common Trusts that State Street Defendants offer and manage. To the extent that the investment advisor for a given Common Trust is not an

6

affiliate of State Street Defendants, State Street Defendants retain the discretion and control over the securities lending feature of the Common Trust.

### III. DEFENDANTS' FIDUCIARY STATUS

19.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under §402(a)(1), 29 U.S.C. §1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i).  The common law is to the same effect.

20.     **Investment Manager**. Under ERISA, an investment manager or investment adviser is a fiduciary. ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title) –
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;
>
> (B) who
>
> (i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.];
>
> (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b-3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by

the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

ERISA §3(38), 29 U.S.C. §1002(38).

21.     Here, at all relevant times, Defendants were named and/or serve as the Investment Manager, Trustee, Advisor or administrator of all the Common Trusts, and the Lending Agent, as described below, and thus were fiduciaries of the Goodyear VEBA and the Plans. Moreover, Defendants exercised discretion and control over the Plans' assets because the State Street Defendants managed the Collateral Pools, and thus decided how to invest the Collateral posted by borrowers. Further, Defendants set their own compensation for managing the securities lending program and received that compensation from the Plans' assets. Thus, Defendants were responsible for prudently and loyally managing the assets that were invested in the Common Trusts and Collateral Pools for the benefit of the Plans.

## IV. DEFENDANTS' FIDUCIARY DUTIES

22.     ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), provides, in relevant part, that a civil action for breach of fiduciary duty for relief under ERISA §409, 29 U.S.C. §1109 may be brought by a participant, beneficiary or fiduciary of a plan.

23.     ERISA §409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in relevant part:

> any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon
> fiduciaries by this subchapter shall be personally liable to make
> good to such plan any losses to the plan resulting from each such
> breach, and to restore to such plan any profits of such fiduciary
> which have been made through use of assets of the plan by the
> fiduciary, and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of
> such fiduciary.

24.     ERISA §§404(a), 29 U.S.C. §§1104(a), provides in relevant part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

25.     These fiduciary duties under ERISA §§404(a) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwith*, 680 F.2d 263, 272 n.2 (2d Cir. 1982). They entail, among other things:

> The duty to avoid conflicts of interest and to resolve them
> promptly when they occur. A fiduciary must always administer a
> plan with an "eye single" to the interests of the participants and
> beneficiaries, regardless of the interests of the fiduciaries
> themselves, including, in this case, the State Street Defendants'
> personal interests in receiving some of the cash collateral from
> securities lending; and

26.     ERISA also prohibits certain transactions with plan involving parties in interest and fiduciaries because of their high potential for abuse. Specifically, ERISA §406 provides as follows:

> (a) Transactions between plan and party in interest
>     Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

    (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
    (B) lending of money or other extension of credit between the plan and a party in interest;
    (C) furnishing of goods, services, or facilities between the plan and a party in interest;
    (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
    (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107 (a) of this title.

(b) Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not—

    (1) deal with the assets of the plan in his own interest or for his own account,
    (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
    (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## V. <u>DEFENDANTS' VIOLATIONS OF ERISA AND THE COMMON LAW</u>

27.      Defendants' violations of ERISA and the common law arise from their self-dealing in selecting themselves as lending agent, paying themselves from Plan assets and setting their own compensation for acting in that capacity, and taking an unreasonable amount of compensation for providing lending services on behalf of the Common Trusts.

28.      As shown above, Defendants were (and are) fiduciaries responsible for managing the Plans' investments in the Common Trusts prudently and solely in the interests of

the Plans and their respective participants and beneficiaries. Defendants received investment advisory, custodial, trustee, and administrative fees for managing the Common Trusts. In addition to investing and managing the Plans' assets in accordance with a given Common Trust's stated objectives, Defendants also invested Plan assets through their securities lending program.

29.     Through the securities lending program, the Common Trusts, and the Plans indirectly, made securities available for loan. Defendants set the terms and conditions, via a securities lending authorization agreement between the Common Trusts and Defendants, of the Common Trusts' participating in the securities lending program. Defendants, acting as the "Lending Agent," decided which securities would be loaned to which borrowers, collected the collateral from the borrowers, and invested the collateral in one or more Collateral Pools.

30.     Defendants established and managed the Collateral Pools and received investment advisory, custodial, trustee, and administrative fees for managing them. In addition, Defendants took fifty percent of the spread, that is, the income, after expenses and rebates, generated by the Collateral Pools. Only half of the income generated from the securities lending collateral went to the Common Trusts. Defendants controlled all aspects of the securities lending program and all agreements and contracts created and executed thereunder.

31.     These arrangements were fraught with conflicts and self-dealing. Defendants managed the Common Trusts and purportedly represented the Common Trusts and the Plans in setting the terms of and executing a Securities Lending Agreement with one or more of themselves, who acted as the Lending Agent. One or more of Defendants, as Lending Agent, then allocated to one or more of Defendants, or an affiliate, the responsibility for managing the collateral investment program via the Collateral Pools. Essentially, Defendants negotiated with themselves the terms of their compensation, discretion, authority, and even liability. Not

11

surprisingly, these arrangements led to Defendants setting and receiving excessive and
unreasonable compensation for themselves.

32.         Although Defendants set their own compensation at fifty percent of the net
income produced by the Collateral Pools pursuant to their self-dealing arrangements, in arm's
length securities lending agreements, Defendants received far less compensation. For example,
Defendants' securities lending arrangements with the state retirement plans of Missouri and
Florida provided that Defendants received only 30% of securities lending income. (Exhibits 1
(Missouri), 2 (Florida).)

33.         Moreover, the fifty percent received by Defendants far exceeds industry
standards. As one financial columnist explained, a "few exemplary firms, like T. Rowe Price
Group and Vanguard Group, rebate all securities-lending income (net of expenses) back to the
funds that generated it. The total cost of Vanguard's securities-lending program is well under
1%, says Tom Higgins, chief financial officer of the funds. That suggests that most of the 30%-
to-50% toll charged by other fund managers is pure profit – in effect, money for nothing." *Is
Your Fund Pawning Shares at Your Expense*, Jason Sweig, Wall Street Journal, May 30, 2009.
(Exhibit 3.)

34.         An August 2002 survey by Plansponsor.com found that the norm for
division of securities lending income was between 70 and 80% to the lender, *i.e.*, the investors.
Charles Ruffel, *Lending Logic* (available at

http://www.plansponsor.com/MagazineArticle.aspx?id=6442460188&magazine=6442459)
(Exhibit 4.)

35.         A leading consultant and investment advisor to retirement plans and other
institutional investors, Enis Knupp & Associates, Inc., reported in an October 2003 article that

securities lending agents typically receive 15 to 35% of the income from collateral investment. *Less is More: Securities Lending Revisited*, Enis Knupp & Associates, Inc., 2003. (Exhibit 5.) The trend for large investors, however, has been toward a split of 80-20 in favor of the investor. *Lending Logic*, *supra*. (Exhibit 4.)

36.     A 2010 RFP shows that plans sponsored by the State of Oklahoma receive 85% of the securities lending income for the securities that they loan. (Exhibit 6.) In 2006, the State of Florida maintained securities lending arrangements with several large banks, including Defendants. Under four of the contracts, Florida plans received 80% of securities lending income, and Florida plans received 70% of the income from its arrangement with SSGA. (Exhibit 2.)

37.     A vice-president at Citibank, Brendan McCarthy, commented, "anyone over $1 billion in assets still at 60/40 should be talking to agent lenders … and any large [investors] ($ billion and better) not at 80/20 should likewise be talking to lenders." *Lending Logic*, *supra*. (Exhibit 4.)

38.     The Common Trusts at issue in this case collectively possessed millions of dollars of holdings. Defendants, fiduciaries of the Common Trusts, of course failed to take advantage of the Common Trusts' massive bargaining power and leverage to negotiate a favorable compensation arrangement for its clients. Instead, they gave themselves a sweetheart deal, 50% of the net lending income, that was not the product of arm's length negotiations.

39.     Each time Defendants received compensation from the Collateral Pools, on information and belief, each fiscal quarter, they engaged in a self-dealing transaction with the Plans' assets. Each Defendant was a fiduciary for the Plans, as alleged above. Therefore, each Defendant was, by definition, also a party-in-interest to the Plans.

13

40.     In setting, receiving, and controlling their own compensation, as well as creating and managing the Collateral Pool investments, Defendants caused all of the securities lending transactions, from making the securities available for loan, to contracting with themselves, to investing the collateral in Collateral Pools, to managing the Collateral Pools, to receiving income from the Collateral Pools. These repeated violations over many years were breaches of their duty of loyalty under ERISA § 404(a) and violations of per se rules against self-dealing transactions under ERISA § 406(b) and of prohibited transactions under §406(a), as well as, alternatively, violations of the common law.

41.     As a result of Defendants' fiduciary breaches and self-dealing, the Plans and their respective participants and beneficiaries suffered hundreds of millions of dollars in losses. Every dollar collected by Defendants in excess of reasonable compensation was one dollar less for the Plans. Moreover, the Plans also suffered additional losses in the form of lost investment opportunity on the securities lending income wrongfully taken by Defendants for themselves. That income would have been reinvested in the respective Common Trusts and would have produced additional gains for the Plans.

## VI. CLASS ACTION ALLEGATIONS

42.     ERISA §§ 409(a) and 502(a)(2) authorize ERISA fiduciaries, such as the Committee, to sue in a representative capacity for losses suffered by plans as a result of breaches of fiduciary duty. Pursuant to that authority, and, alternatively, pursuant to the common law, the Committee brings this action as a class action under Fed. R. Civ. P. 23 on behalf of the Goodyear VEBA and all other similarly-situated Plans, *i.e.,* all the ERISA Plans – or, alternatively, all the Plans – that invested Collateral in the Collateral Pools through the Common Trusts. The Committee seeks to restore losses to the Plans, for which the State Street Defendants are

personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2), and, alternatively, pursuant to the common law.

43.      **Class Definition**. The Committee brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of itself  and the following class of persons similarly situated (the "ERISA Class"):

> ERISA plans that, during the period January 22, 2007 to the present: (1) invested in a Common Trust established by Defendants that loaned securities under a Master Securities Lending Authorization Agreement, and (2) paid to Defendants fifty percent (50%) of the net securities lending income that the Common Trust earned from a Lending Fund.[1]

Alternatively, with respect to Count III, asserting (in the alternative) claims for breach of fiduciary duty under the common law, the Committee brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of itself and the following class of persons similarly situated (the Non-ERISA Class"):

> Plans that, during the period January 22, 2007 to the present: (1) invested in a Common Trust established by Defendants that loaned securities under a Master Securities Lending Authorization Agreement, and (2) paid to Defendants fifty percent (50%) of the net securities lending income that the Common Trust earned from a Lending Fund.

44.      **Numerosity**. The members of each of the ERISA Class and the Non-ERISA Class (collectively, the "Classes") are so numerous that joinder of all members is impracticable. While the exact number of the members of each Class is unknown to the Committee at this time and can only be ascertained through appropriate discovery, the

---

[1] The ("Lending Funds") are those collective investment funds managed by SSgA that lend securities under Defendants' securities lending program.

Committee understands that dozens or hundreds of ERISA Plans and Non-ERISA Plans throughout the country invested in the Common Trusts during the Class Period, and sustained losses as a result of the State Street Defendants' securities lending activities.

45.        **Commonalilty**. The claims of the Committee and all members of each of the Classes originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by the Defendants. Proceeding as a class action is particularly appropriate here, because Goodyear VEBA  assets were held in Common Trusts and/or Collateral Pools managed by the Defendants, where each investor shared in gains and losses on a pro rata basis, and, therefore, Defendants' imprudent actions affected all Plans in the same manner. Furthermore, common questions of law and fact exist as to all members of each of the Classes and predominate over any questions solely affecting individual members of each of the Classes. The many questions of law and fact common to the each of the Classes include:

a.        Whether Defendants are fiduciaries;

b.        Whether Defendants breached their fiduciary duties;

c.        Whether Defendants' acts proximately caused losses to the Plans and, if so, the appropriate relief to which the Committee, on behalf of the Plans and the each of the Classes, is entitled;

d.        Whether the compensation Defendants received in connection with transactions involving Plan assets was reasonable;

e.        Whether Defendants caused the Plans to engage in prohibited transactions with parties in interest, fiduciaries, and Defendants or their affiliates;

f.        Whether an affirmative defense to prohibited transactions applies and can be satisfied by Defendants.

46.        **Typicality.** The Committee's claims are typical of the claims of the members of each of the Classes because the Committee seeks relief on behalf of the Plans pursuant to ERISA §502(a)(2), and, alternatively, pursuant to the common law, and, thus, the Committee's claims on behalf of the Plans are not only typical of, but identical to, a claim brought by any  member of each of the Classes. If cases were brought and prosecuted individually, each of the members of the Classes would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

47.        **Adequacy.** The Committee will fairly and adequately protect the interests of the members of the Classes and has retained counsel competent and experienced in class action, ERISA, and fiduciary litigation. The Committee has no interests antagonistic to or in conflict with those of the Classes.

48.        **Rule 23(b) (1)(A) & (B) Requirements.** Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Classes would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Classes would create a risk of adjudications with respect to individual members of the Classes that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.        **Rule 23(b)(2) Requirements.** Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Classes,

thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Classes as a whole.

50.        **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Classes predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII. <u>REMEDY UNDER ERISA FOR BREACHES OF FIDUCIARY DUTIES</u>

51.        ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), authorizes the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan, to bring a civil action for appropriate relief under ERISA §409, 29 U.S.C. §1109. Section 409 requires "any person who is a fiduciary ... who breaches any of the ... duties imposed upon fiduciaries ... to make good such plan any losses to the plan ...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate....", including disgorgement of all fees and compensation received by Defendants as a result of their unlawful conduct.

52.        With respect to calculation of the losses to the ERISA Plans, breaches of fiduciary duty result in a presumption that, but for the violations of ERISA, the ERISA Plans would have received hundreds of millions of dollars in additional securities lending income and additional investment returns on that reinvested income. In this way, the remedy restores the ERISA Plans' lost value and puts the participants in the position they would have occupied had the ERISA Plans been properly administered.

53.        Plaintiff, on behalf of the ERISA Plans, is therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the ERISA Plans in an amount to be proven at trial based on the principles described above, as provided by ERISA §409(a), 29

U.S.C. §1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches

alleged above, including on order permitting the ERISA Plans and the ERISA Class to withdraw

assets from Common Trusts, as provided by ERISA §§409(a), 502(a)(2) and (3), 29 U.S.C.

§§1109(a), 1132(a)(2); (c) disgorgement of compensation and profits earned thereon as a result

of prohibited transactions; (d) reasonable attorney fees and expenses, as provided by ERISA

§502(g), 29 U.S.C. §1132(g), the common fund doctrine, and other applicable law; (e) taxable

costs and interest on these amounts, as provided by law; and (f) such other legal or equitable

relief as may be just and proper.

54.     Under ERISA, each Defendant is jointly and severally liable.

## VIII. CLAIMS FOR RELIEF

### COUNT I
### FOR PROHIBITED TRANSACTIONS INVOLVING PLAN ASSETS

55.     The Committee repeats and realleges each of the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

56.     Under Section 3(21) of ERISA, 29 U.S.C. §1002(21), Defendants were at

all relevant times ERISA fiduciaries with respect to the Goodyear VEBA and the invested assets

of the ERISA Plans.

57.     Under Section 3(38) of ERISA, 29 U.S.C. §1002(38), one or more of

Defendants were at all relevant times the Investment Managers of the Goodyear VEBA and the

ERISA Plans.

58.     The scope of the fiduciary duties and responsibilities of the Defendants

included managing the assets of the Goodyear VEBA and the ERISA Plans.

59.     Defendants, through the Common Trusts, engaged in numerous self-

dealing and prohibited transactions with fiduciaries and parties in interest, namely themselves,

which transactions were *per se* prohibited by Section 406 of ERISA, 29 U.S.C. §1106. Such

transactions were not exempted by an individual, class, or statutory exemption.

60.         Pursuant to ERISA §§409, 502(a)(2), and (a)(3), 29 U.S.C. §§1109(a), and

1132(a)(2), Defendants are liable to restore the losses to the Goodyear VEBA and the ERISA

Plans caused by their violations of Section 406, and to disgorge their compensation and profits

thereon, and subject to other equitable relief as appropriate.

## COUNT II
## FOR FAILURE TO PRUDENTLY AND LOYALLY MANAGE PLAN ASSETS

61.         The Committee repeats and realleges each of the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

62.         Under Section 3(21) of ERISA, 29 U.S.C. §1002(21), Defendants were at

all relevant times ERISA fiduciaries with respect to the Goodyear VEBA and the invested assets

of the Goodyear VEBA.

63.         Under Section 3(38) of ERISA, 29 U.S.C. §1002(38), one or more of

Defendants were at all relevant times the Investment Managers of the Goodyear VEBA and the

ERISA Plans.

64.         The scope of the fiduciary duties and responsibilities of Defendants

included managing the assets of the Goodyear VEBA and the ERISA Plans.

65.         Defendants were obligated to discharge their duties with respect to the

Goodyear VEBA and the ERISA Plans' assets with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

66.        Contrary to their duties and obligations under ERISA, Defendants failed loyally and prudently to manage the assets of the Goodyear VEBA and the ERISA Plans. Specifically, Defendants breached their duties to the Goodyear VEBA and the ERISA Plans and their participants, in violation of ERISA §404(a), by, *inter alia*, entering into contracts with their affiliates purportedly for the benefit of the Goodyear VEBA and the ERISA Plans, in which the Goodyear VEBA and the ERISA Plans were not represented by independent fiduciaries in order for Defendants to award themselves unreasonable compensation far in excess of industry standards.

67.        As a consequence of Defendants' breaches of fiduciary duties, the Goodyear VEBA and the ERISA Plans suffered massive losses. Had Defendants collected reasonable compensation, the losses suffered by the Goodyear VEBA and the ERISA Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the ERISA Plans collectively lost hundreds of millions of dollars of retirement savings.

68.        Pursuant to ERISA §§409, 502(a)(2) and (3), 29 U.S.C. §§1109(a), and 1132(a)(2), Defendants are liable to restore the losses to the ERISA Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**COUNT III**
(In the Alternative)
**FOR BREACH OF FIDUCIARY DUTY UNDER MASSACHUSETTS COMMON LAW**

69.        Plaintiffs incorporate by reference and reallege each and every allegation

21

above as though fully set forth herein.

70.        In the event that the Goodyear VEBA and/or the Plans are determined not

to be governed by ERISA, Defendants nonetheless owed, at all relevant times, fiduciary duties to

the Goodyear VEBA and the Plans under Massachusetts law.  Pursuant to the trust agreements

between Defendants and members of the proposed Non-ERISA Class and the declarations of

trust establishing the Common Trusts, Defendants served as the trustee and investment manager

of plan assets in the Collateral Pools.  As such, they owed Plaintiff and the Plans the highest

obligation of due care, good faith and loyalty. The scope of the fiduciary duties and

responsibilities of Defendants included managing the assets of the Goodyear VEBA and the

Plans, including the cash collateral derived from securities lending and invested in the Collateral

Pools.

71.        Defendants were obligated to discharge their duties with respect to the

Goodyear VEBA and the Plans' assets with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims. In

addition, Defendants were obligated to act for the benefit of Plaintiff and the Plans and to refrain

acting in their own interests or utilizing Plan assets for their own benefit or gain.

72.        Contrary to their duties and obligations under ERISA, Defendants failed

loyally and prudently to manage the assets of the Goodyear VEBA and the Plans. Specifically,

Defendants breached their duties to the Goodyear VEBA and the Plans by, *inter alia*, entering

into contracts with themselves or their affiliates purportedly for the benefit of the Goodyear

VEBA and the Plans, in which the Goodyear VEBA and the Plans were not represented by

independent fiduciaries in order for Defendants to award themselves unreasonable compensation far in excess of industry standards.

73.          As a consequence of Defendants' breaches of fiduciary duties, the Goodyear VEBA and the Plans suffered massive losses. Had Defendants collected reasonable compensation, the losses suffered by the Goodyear VEBA and the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans collectively lost hundreds of millions of dollars.

## IX. <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Committee prays for judgment as follows:

A.          A determination that this action is a proper class action and certifying the Committee as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.          A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Goodyear VEBA and the Classes;

C.          A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA §404(c)(1)(B), 29 U.S.C. §1104(c)(1)(B);

D.          A Declaration that Defendants, and each of them, have violated ERISA §406, 29 U.S.C. §1106;

E.          A Declaration, in the alternative, that Defendants, and each of them, have breached their common law fiduciary duties to the Goodyear VEBA and the Non-ERISA Class.

F.          An Order compelling Defendants to make good to the Goodyear VEBA and the Classes all losses resulting from the securities lending program and to restore to the Goodyear VEBA and the Classes all profits that the participants and beneficiaries would have made if

Defendants had fulfilled their fiduciary obligations;

G.      Imposition of a constructive trust on any amounts by which any Defendants were unjustly enriched at the expense of the Goodyear VEBA and the Classes as the result of beaches of fiduciary duty;

H.      Restoration of any losses to the Goodyear VEBA and the Classes, allocated among the participants' individual accounts within the Goodyear VEBA and the Class of Plans, in proportion to the accounts' losses;

I.       Recovery of 100 percent of the securities lending fees paid to Defendants in violation of ERISA §406, 29 U.S.C. §1106;

J.       An Order awarding costs, including pursuant to 29 U.S.C. §1132(g);

K.      An Order awarding attorney fees pursuant to the common fund doctrine, 29 U.S.C. §1132(g), and other applicable law;

L.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants; and

M.      Granting such other and further relief as the Court may deem just and proper.

## X. DEMAND FOR JURY TRIAL

The Committee demands a jury trial on all claims so triable.

Dated: January 21, 2013                          Respectfully submitted,


Todd M. Schneider                        */s/ John Roddy*
Mark T. Johnson                          John Roddy, BBO No. 424240
SCHNEIDER WALLACE COTTRELL               BAILEY & GLASSER LLP
BRAYTON KONECKY LLP                      125 Summer Street
180 Montgomery Street, Suite 2000        Suite 1030
San Francisco, CA 94104                  Boston, MA 02110
Tel: (415) 421-7100                      Tel: (617) 439-6730
Fax: (415) 421-7105                      Fax: (617) 951-3954

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
8501 North Scottsdale Rd., Suite 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036

Todd S. Collins
Shanon J. Carson
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3040
Fax: (215) 875-4604

Gregory Y. Porter
BAILEY & GLASSER LLP
910 17th Street, NW
Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103

Brian A. Glasser
Michael L. Murphy
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Tel: (304) 345-6555
Fax: (304) 342-1110

*Attorneys for Plaintiff*